Filed 6/25/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTOPHER LEVANOFF et al., | |
| Plaintiffs and Appellants, | G058480, G058709 |
| v. | (Super. Ct. No. 30-2011-00511808) |
| MATTHEW DRAGAS et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeals from orders of the Superior Court of Orange County, Glenda Sanders, Judge. Affirmed.

Mahoney Law Group, Kevin Mahoney, Katherine J. Odenbreit; Ferguson Case Orr Paterson, Wendy C. Lascher and John A. Hribar for Plaintiffs and Appellants.

CDF Labor Law, Timothy M. Freudenberger, Amy S. Williams, Nancy N. Lubrano; Duckor, Spradling, Metzger & Wynne, William Patrick Keith and Scott L. Metzger for Defendants and Respondents.

\* \* \*

# INTRODUCTION

The issue presented by this appeal is whether defendant employers violated California law in their method of calculating the regular rate of pay for purposes of compensating overtime hours of employees who worked at different rates of pay within a single pay period (dual rate employees). Defendants used the rate-in-effect method, by which dual rate employees are paid for overtime hours based on the rate in effect when the overtime hours began. Plaintiffs contend that California law required defendants to use the weighted average method, by which dual rate employees are paid for overtime based on an hourly rate calculated by adding all hours worked in one pay period and dividing that number into the employee's total compensation for the pay period.

Plaintiffs are employees of Buffalo Wild Wings Restaurants owned and/or operated by defendants. In their lawsuit against defendants, plaintiffs asserted individual and class claims under various provisions of the Labor Code and the California Unfair Competition Law, and claims for violations of the Labor Code Private Attorneys General Act of 2004, Labor Code section 2698 et seq. (PAGA). The trial court certified eight classes and two subclasses, but later decertified all classes except for a subclass of dual rate employees who allegedly were underpaid by defendants for overtime hours worked. We refer to this subclass as the dual rate overtime subclass.

By agreement of the parties, a bench trial was conducted on the issue of liability under PAGA for underpayment of overtime hours worked by dual rate employees. In a thorough statement of decision, the trial court found, among other things, that defendants did not violate California employment law by using the rate-in-effect method for calculating the overtime rate of pay. Based on the ruling in the bench trial, the trial court decertified the dual rate overtime subclass and dismissed the PAGA claims. Plaintiffs appeal from the order decertifying the dual rate overtime subclass and the order dismissing the PAGA claims.

We affirm. We agree with the trial court and hold defendants did not violate California law by using the rate-in-effect method for calculating the regular rate of pay for purposes of establishing the overtime rate of pay for dual rate employees. The method employers must always use is an issue we need not decide: The only issue before us is whether under the facts of this case defendants' use of the rate-in-effect method was lawful. California law does not mandate the use of the weighted average method, and defendants' dual rate employees, including plaintiffs, overall received net greater overtime pay under the rate-in-effect method than they would have received under the weighted average method. Because defendants did not violate California law by using the rate-in-effect method, the trial court did not err by decertifying the dual rate overtime subclass and dismissing the dual rate overtime PAGA claim.

## ALLEGATIONS AND PROCEDURAL HISTORY

### I.

### The Parties and Allegations of the Complaints

Plaintiffs are Christopher Levanoff, Alison Diaz, Andrew Gaxiola, and Jenna Steed (collectively Plaintiffs). They were employees of several Buffalo Wild Wings Restaurants owned and/or operated by defendants Matthew Dragas, SoCal Wings LLC, SC Wings Buena Park, SC Wings Aliso Viejo, LLC, SC Wings Mission Viejo, LLC, SC Wings Block, LLC, and Dragas Homes, Inc. (collectively Defendants). Plaintiffs were employed in various capacities, including server, bartender, certified trainer, manager-in-training, and shift lead.

In 2011, Plaintiffs initiated this lawsuit on behalf of themselves and a plaintiff class. The Second Amended Complaint alleged eight causes of action: (1) failure to pay overtime wages, (2) failure to provide meal periods, (3) failure to provide rest periods, (4) failure to pay wages upon ending employment, (5) failure to keep accurate payroll records, (6) violation of the California Unfair Competition Law,

3

Business and Professions Code section 17200 et seq., (7) violation of Labor Code section 558, and (8) violation of PAGA. The Second Amended Complaint alleged nine classes and two subclasses. Relevant here is subclass I within class 1, the dual rate overtime subclass, alleged to consist of "[a]ll current and former California hourly non-exempt employees who work or worked for Defendants during the Class Period who worked over eight (8) hours in a day or forty (40) hours in a week without receiving proper overtime payments because the overtime payments were calculated using the lower regular rate of pay." The class period was "September 28, 2007 to the present."

In 2014, the trial court partially granted Plaintiffs' motion for class certification and certified all classes and subclasses, with one exception not relevant to this appeal.

Plaintiffs filed the Third Amended Complaint in January 2015. It is the operative pleading and has the same causes of action and the same classes and subclasses as alleged in the Second Amended Complaint.

## II.

### The Dual Rate Overtime PAGA Claim and Subclass

None of the complaints alleged that Defendants violated California employment law by using the rate-in-effect method instead of the weighted average method to calculate regular rate of pay for determining overtime pay of dual rate employees. Instead, the dual rate overtime subclass claim in the Second Amended Complaint and the Third Amended Complaint was based on allegations that Defendants paid certain employees different rates of pay for performing the same type of work during the same pay period and, as a result, underpaid certain employees for overtime hours.

In the motion for class certification, Plaintiffs asserted that Defendants violated California law by failing to use the weighted average method for calculating regular rates of pay used for calculating the rate of overtime pay. At a pretrial hearing on

4

motions in limine, the trial court, over Defendants' objection, allowed Plaintiffs "to keep" the dual rate overtime claim based on failure to use a weighted average and found "it is both a PAGA issue and a class action issue."

Later, a proposed statement of joint stipulated facts defined the dual rate overtime subclass to include "any non-exempt employee[s] of Defendants who were paid at two or more different rates of pay for different work in a workweek in which they worked overtime from the beginning of the statutory period as determined by the Court through September 8, 2015."

## III.

### Class Decertification with Exception of
### Dual Rate Overtime Subclass

In June 2017, the trial court decertified the class with the exception of the dual rate overtime subclass. As of that date, therefore, Plaintiffs' claims consisted of the dual rate overtime subclass claim and the PAGA claim, which was limited to a dual rate overtime PAGA claim.[1]

Two months later, Plaintiffs submitted a "Post Decertification Proposed Trial Plan" (the Trial Plan) in which Plaintiffs proposed that the dual rate overtime PAGA claim be tried to the court and "[f]ollowing the bench trial, if there are any class or legal claims left to be decided that were not determined in the bench trial they will be presented to a jury as they relate to the Dual Rate [Overtime] Subclass." According to the Trial Plan, "[t]he dual rate violations will be determined during the PAGA trial, so with respect to liability, there should be no issue for the jury to determine." In addition, the Trial Plan provided that the trial court's written findings establishing liability, if any, would be binding on the jury, and the jury's sole task with respect to the dual rate overtime subclass would be to award damages.

---

[1] PAGA claims are not subject to class certification requirements. (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 982-983.)

In January 2018, the trial court denied a motion in limine by Defendants to exclude all evidence and argument on the dual rate overtime issue. The court ruled that the dual rate overtime issue involved questions of fact and could not be decided based on the pleadings and undisputed facts.

## IV.

### Bench Trial on Dual Rate Overtime PAGA Claim

A bench trial on the liability portion of Plaintiffs' dual rate overtime PAGA claim commenced on January 31, 2018, and continued off and on until late June. Ten witnesses, including two experts, offered live testimony.

At trial, both Plaintiffs' expert and Defendants' expert testified that Levanoff and Diaz (the only dual rate overtime subclass plaintiffs) received greater overtime pay under the rate-in-effect method than they would have received under the weighted average method. Defendants' expert also concluded the dual rate overtime PAGA group members received net greater overtime time pay because Defendants had used the rate-in-effect method. Plaintiffs' expert agreed. Plaintiffs' expert testified that the dual rate overtime PAGA group members overall received $2,065.74 net greater overtime pay because Defendants had used the rate-in-effect method.

The trial court ruled in favor of Defendants and, in February 2019, issued a lengthy and thorough statement of decision. The statement of decision provided the following summary: "First, Plaintiffs failed to exhaust the administrative prerequisites necessary to pursue their PAGA claim based on Defendants' use of the rate-in-effect method of overtime calculation ('the dual rate' claim). Second, Plaintiffs' dual rate PAGA claim is barred by the statute of limitations. Third, on the merits, Plaintiffs failed to prove that Defendants' use of a rate-in-effect method to calculate overtime in dual rate workweeks violated any labor law including Labor Code section 1194 upon which they relied in their Notice to the LWDA [Labor and Workforce Development Agency] and

6

certain Defendants.  Finally, even if Defendants did violate the law by using the rate-in-effect method to calculate overtime, the impact on employees was *de minimis*."

The trial court then made findings and conclusions, which we summarize in the following 11 points:

1.  There is no binding state or federal law requiring the use of a particular method of calculating overtime in dual rate workweeks "in general or in the unique factual circumstances of this case."

2.  The California Division of Labor Standards Enforcement Policies and Interpretations Manual (June 2002 rev.) (the DLSE Manual) has adopted the weighted average method of computation.  But the DLSE Manual's adoption of the weighted average method is not binding and is accorded no deference because "it reflects no 'expertise and special competence' with the problem at issue," did not rely on a rationale that had been articulated in prior letters, and relied on inapposite law.

3.  *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542 (*Alvarado*) does not mandate use of the weighted average method of computation.  The Supreme Court's comments about the weighted average method in that opinion were dicta.

4.  California law requires employers to use a method of compensation that is most economically beneficial to the group of employees at issue.  "California has long recognized that employer compensation practices must be evaluated based upon the impact of the practice on the entire group of employees at issue during the relevant statutory period—not on an employee by employee, day by day, week by week or pay period by [pay] period basis."

5.  Plaintiffs failed to prove that use of the weighted average method would have better protected Defendants' dual rate employees.  The undisputed evidence demonstrated that use of the rate-in-effect method produced greater economic benefit to dual rate employees as a whole over the relevant time period.

7

6. Use of the rate-in-effect method was "fair and neutral" because it resulted in a net economic benefit for Defendants' dual rate employees as a whole. "[T]he evidence demonstrates that most employees received significantly more overtime compensation than they would have received had Defendants used the weighted average method."

7. The undisputed evidence demonstrated that Defendants selected the rate-in-effect method because it would provide the greatest overall compensation to dual rate employees.

8. "[T]he rate-in-effect method is arguably more transparent than the weighted average method because with the rate-in-effect method the employee's wage statement reflects the hours worked and associated rates of pay, whereas the weighted average method requires the employee to conduct a series of mathematical calculations to determine whether her compensation was accurate."

9. Under federal law, the rate-in-effect method is lawful if the overtime compensation was paid pursuant to an agreement or understanding arrived at between the employer and the employee in advance of performance of the work. (29 U.S.C. § 207(g)(2); 29 C.F.R. § 778.419.) Here, the requirement of an agreement or understanding was satisfied. The evidence showed that all employees were told, before performing any work, the method for calculating pay for non-overtime and overtime hours if the employee performed different jobs at different rates of pay. "After being informed of this method of compensation, all employees agreed to these terms by performing work and accepting the compensation for such work for the entire period of their employment."

10. The maxim *de minimis non curat lex* (de minimis principle) applies and precludes liability. "This case is an illustration of expensive litigation which results in no real benefit to complainant but may injure others. [Citation.] Even aggregated, the

difference in methodologies massively benefits the employees as a whole, and any negative impact is *de minimis.*"

11. The court concluded: "This claim does not vindicate the rights of allegedly aggrieved employees. The dual rate claim appears to be an afterthought contemplated long after the original complaint was filed—a claim that was never presented to the LWDA."

The trial court's decision resolved the dual rate overtime PAGA claim. What remained were the other PAGA Labor Code violation claims, the dual rate overtime subclass claim, and the individual claims.

## V.

### Decertification of Dual Rate Overtime Subclass and Dismissal of PAGA Claims

Based on the trial court's ruling in the trial of the dual rate overtime PAGA claim, Defendants moved to decertify the dual rate overtime subclass. In August 2019, the trial court granted the motion and decertified the dual rate overtime subclass. The court found that Plaintiffs had agreed in the Trial Plan to a bench trial on the PAGA claim based on the dual rate overtime theory and had agreed the court's decision would be binding on the jury. "Having done so, Plaintiffs, who proposed a bench trial on the PAGA claim, are now bound by the Court's finding that Defendants did not violate any law by their use of the rate-in-effect method of calculating the overtime rate. That finding mandates decertification and Defendants' motion is **granted**."

In October 2019 Plaintiffs filed a notice of appeal from the order decertifying the dual rate overtime subclass. This appeal is case No. G058480.

Thereafter, the parties stipulated to dismissal of the remaining PAGA claims. Based on that stipulation, the trial court dismissed the remaining PAGA claims with prejudice. As a consequence, only Plaintiffs' individual claims remain.

9

Plaintiffs filed a notice of appeal from the order dismissing the PAGA claims. This appeal is case No. G058709. We granted the parties' stipulated motion to consolidate the two appeals for all purposes.

## DISCUSSION

### I.

### Appealability and Standard of Review

The order decertifying the dual rate overtime subclass is appealable under the "death knell doctrine" because that order entirely terminated the class claims. (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 758.) The order dismissing the PAGA claims also is appealable under the death knell doctrine. (*Miranda v. Anderson Enterprises, Inc.* (2015) 241 Cal.App.4th 196, 200-203.) Pursuant to Code of Civil Procedure section 906, we may review the trial court's decision on the dual rate overtime PAGA claim because that decision "involves the merits or necessarily affects the judgment or order appealed from." (Code Civ. Proc., § 906.)

Orders regarding class certification are reviewed under the abuse of discretion standard. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326-327.) A trial court ruling supported by substantial evidence generally will not be disturbed unless (1) improper criteria were used or (2) erroneous legal assumptions were made. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.) A trial court's decision that rests on an error of law is an abuse of discretion. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 629.)

### II.

### The Scope of Appeal Is Limited to the Stated Reasons for Decertifying the Dual Rate Overtime Subclass

Defendants argue we need not reach the issue of how to calculate the regular rate of pay for dual rate employees because common issues of law or fact did not

10

predominate.[2] Defendants argue that Plaintiffs never pleaded the dual rate overtime theory of liability, the named plaintiffs received more overtime compensation under the rate-in-effect method, and the majority of the subclass members never experienced a workweek in which the rate-in-effect method produced an underpayment of overtime.

The scope of our review of the order decertifying the dual rate overtime subclass is limited to the reasons stated by the trial court. "Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling." (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939.)

In the order decertifying the dual rate overtime subclass, the trial court gave a single reason for decertification: "Plaintiffs, who proposed a bench trial on the PAGA claim, are now bound by the Court's finding that Defendants did not violate any law by their use of the rate-in-effect method of calculating the overtime rate. That finding mandates decertification and Defendants' motion is **granted**." The trial court gave no other reason for ordering decertification. Any other issue regarding class certification is beyond the scope of our review.

Defendants are correct in asserting that none of Plaintiffs' complaints alleged the dual rate overtime claim that was tried. The theory first appeared, at least in

---

[2] The party seeking class certification must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that make a class action superior to the alternatives. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) The community of interest requirement has three factors: (1) common questions of law or fact predominate; (2) class representatives have claims or defenses typical of the class; and (3) class representatives can adequately represent the class. (*Ibid.*)

11

court-filed documents, in Plaintiffs' motion for class certification.  But the trial court, by allowing Plaintiffs "to keep" their dual rate overtime theory, in effect granted them leave to amend to state that theory as both a class claim and a PAGA claim.  Defendants do not argue they have suffered in prejudice as a consequence.

Defendants argue we need not reach the issue of calculating rate of pay for dual rate employees because the dual rate overtime PAGA claim is barred by the statute of limitations and by Plaintiffs' failure to exhaust administrative remedies.  In the statement of decision, the trial court found that Plaintiffs had failed to exhaust their administrative remedies as to the dual rate overtime PAGA claim and that that claim was time-barred.  Those findings apply, however, only to that PAGA claim.[3]  The purpose of the bench trial was to decide the issue of liability for both the dual rate overtime PAGA claim and the class claim "so with respect to liability, there should be no issue for the jury to determine."  Resolution of the dual rate overtime PAGA claim was necessary for purposes of the class claim regardless of the disposition of the PAGA claim.

## III.

### Defendants Did Not Violate California Employment Law by Using the Rate-in-effect Method

Plaintiffs' dual rate overtime claims (both the PAGA claim and the class claim) asserted failure to pay overtime wages pursuant to Labor Code sections 510 and 1194.  Plaintiffs contended that Defendants violated Labor Code section 1194, which permits an employee to recover by means of a civil action the full amount of legal overtime compensation (*id.*, § 1194, subd. (a)), by using the rate-in-effect method of calculating the regular rate of pay of dual rate employees instead of the weighted average method.

---

[3]  Plaintiffs' failure to challenge those findings on appeal means the order dismissing the PAGA claim would be affirmed regardless of our decision on the issue whether Defendants violated California law by using the rate-in-effect method.

12

A. *The Weighted Average Method and the Rate-in-effect Method*

Wage and hour claims are governed by provisions of the Labor Code and by 18 wage orders adopted by the Industrial Welfare Commission (IWC). (*Brinker, supra*, 53 Cal.4th at p. 1026.) IWC wage orders are accorded the dignity of statutes and are presumptively valid. (*Id*. at p. 1027.)

Labor Code section 510 and IWC Wage Order No. 5-2001 (IWC Wage Order No. 5)[4] require that restaurant workers be compensated for "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek" at the rate of no less than 1.5 times the employee's "regular rate of pay." (Lab. Code, § 510, subd. (a); see IWC Wage Order No. 5, §§ 2(P)(1), 3(A)(1)(a).) Work in excess of 12 hours in one day and in excess of eight hours on any seventh day of a workweek must be compensated at the rate of no less the twice the employee's "regular rate of pay." (Lab. Code, § 510, subd. (a); see IWC Wage Order No. 5, § 3(A)(1)(b).)

Neither Labor Code section 510 nor IWC Wage Order No. 5 defines the term "regular rate of pay." When an employee works at the same rate of pay during a workweek, calculation of regular rate of pay presents no complications. But some employees work at different rates of pay rather than a fixed rate during a single workweek. For these dual rate employees, two methods for calculating the regular rate of pay have been developed.

One method, called the weighted average method, establishes the regular rate of pay by "adding all hours worked in the week and dividing that number into the total compensation for the week." (DLSE Manual, *supra*, § 49.2.5.) The weighted average method ensures that when a dual rate employee works overtime hours during a

---

[4] IWC Wage Order No. 5 applies to restaurant workers (*Brinker, supra*, 53 Cal.4th at p. 1027 & fn. 7) and is found at California Code of Regulations, title 8, section 11050. IWC Wage Order No. 5 provides essentially the same overtime rules as Labor Code section 510 (see Cal. Code Regs., tit. 8, § 11050, subd. (3)(A)(1)).

low-paying shift, the employee's compensation will be based on a regular rate of pay that accounts for higher pay rates earned during higher paying shifts.  (*Alvarado, supra*, 4 Cal.5th at pp. 569-570.)

Under the other method, called rate-in-effect method, the regular rate of pay is the hourly rate in effect at the time the overtime hours began.  (Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1992.05.14, Calculation of Regular Rate of Pay (May 14, 1992), p. 1 <http://www.dir.ca.gov/dlse/opinions/1992-05-14.pdf>; see 29 U.S.C. § 207(g)(2); 29 C.F.R. §§ 778.417, 778.419.)  The rate-in-effect method ensures that a dual rate employee who works overtime hours during a higher paying shift will be compensated based on that higher rate.  The rate-in-effect method has the added benefit of being a simpler method for computing overtime pay than the weighted average method.  (29 C.F.R. § 778.416.)

The DLSE Manual has endorsed the weighted average method for calculating the regular rate of pay for dual rate employees.  Section 49.2.5 of the DLSE Manual states:  "Where two rates of pay are paid during a workweek, the California method for determining the regular rate of pay for calculating overtime in that workweek mirrors the federal method, based upon the weighted average of all hourly rates paid.  (See 29 CFR § 778.115)  Initially, therefore, it must be predicated upon the finding that there are established hourly rates being paid.  The rate will be established by adding all hours worked in the week and dividing that number into the total compensation for the week.  This is consistent with the provisions of *Skyline v. DIR* (1985) 165 Cal.App.3d 239, since the hourly rates have already been established and what needs to be established now is the weighted average of those rates for purposes of overtime payment."  (Italics added.)

The DLSE Manual permits one exception to the weighted average method.  "In the situation where an employee is paid two rates during the course of the day and

14

one of those rates is a statutorily-mandated rate (i.e., prevailing wage) the regular rate for calculating the overtime rate for work performed on the public works project must be based on the higher of either the weighted average or the prevailing wage rate in effect at the time the worked is performed."  (DLSE Manual, *supra*, § 49.2.6, fn. omitted.)

Federal law requires that certain overtime hours be compensated at no less than 1.5 times the "regular rate."  (29 U.S.C. § 207(a)(2).)  The "regular rate" is defined by federal regulation as an hourly rate that is determined by taking an employee's total regular remuneration for employment in any workweek and dividing by the total number of hours actually worked in that workweek for which such compensation was paid.  (29 C.F.R. § 778.109.)  When an employee is subject to more than one rate of pay, federal regulations define the regular rate of pay as the "the weighted average of such rates."  (29 C.F.R. § 778.115; see 29 U.S.C. § 207(g); 29 C.F.R. § 778.109.)  The weighted average is the employee's compensation during the pay period at all rates divided by the total number of hours worked at all jobs.  (29 C.F.R. § 778.115.)

Federal law permits employers to compute overtime pay for dual rate employees by means other than the weighted average method under certain circumstances and if certain conditions are met.  (29 U.S.C. § 207(g); 29 C.F.R. § 778.415–778.419.)  One such circumstance is when an employee reaches an agreement in advance of the performance of the work to be paid during overtime hours "at a rate not less than one and one-half times the hourly nonovertime rate established for the type of work he is performing during such overtime hours."  (29 C.F.R. § 778.419(a).)

B.  *California Law Does Not Mandate Use of the Weighted Average Method*

The trial court concluded that California law does not mandate the use of either method for calculating regular rate of pay "in general or in the unique factual circumstances of this case."  Plaintiffs disagree:  They argue that in *Alvarado, supra*, 4 Cal.5th 542, the California Supreme Court approved the DLSE Manual, which requires

the use of the weighted average method, and thereby mandated the use of that method to calculate regular rates of pay.

Statements in the DLSE Manual are not binding. (*Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829, 841.) Although the DLSE Manual is the product of efforts to organize enforcement policies and achieve a measure of uniformity, it was prepared without input from employers, employees, or the general public.[5] (*Alvarado, supra*, 4 Cal.5th at p. 555.) Sections 49.2.5 and 49.2.6 of the DLSE Manual are not restatements or summaries of the agency's decision in prior cases and advice letters; they select between two competing interpretations of the law and develop an interpretation intended to function as a rule to be followed prospectively. (See *Alvarado, supra*, at p. 556.) The DLSE Manual sections dealing with calculating regular rates of pay for dual rate employees are, therefore, regulations within the meaning of the Administrative Procedure Act (APA), Government Code section 11340 et seq. (*Alvarado, supra*, 4 Cal.5th at p. 556.)

We are not bound by, and accord no deference to, sections 49.2.5 and 49.2.6 of the DLSE Manual because it was not adopted in accordance with the requirements of the APA. "[W]hen the APA applies, administrative policies that are not adopted in accordance with its requirements are 'void' regulations that are 'not entitled to any deference.'" (*Alvarado, supra*, 4 Cal.5th at p. 556.)

Plaintiffs argue that California law requires the use of the weighted average method because it was approved by the California Supreme Court in *Alvarado, supra*, 4 Cal.5th 542. But *Alvarado* addressed an issue entirely different from the one presented in this case: The issue presented in *Alvarado* was how to calculate an employee's overtime pay rate when the employee had earned a flat-sum bonus (an attendance bonus

---

[5] What input we do have on DLSE Manual section 49.2.5 is the evidence presented at trial in this case, which supports a conclusion that the rate-in-effect method may well (as here) provide greater benefit and protection to employees.

16

for working a full shift on a Saturday or Sunday) during a pay period. (*Id.* at p. 549.) The question in particular was which divisor (the number of hours) to use for purposes of calculating the per-hour value of the bonus. (*Ibid.*) The court concluded the divisor is the number of nonovertime hours the employee actually worked during the relevant pay period, not the number of nonovertime hours that exist in the pay period or the number of nonovertime and overtime hours actually worked by the employee during the pay period. (*Id.* at pp. 549, 568.) This conclusion, the court noted, was consistent with the DLSE's enforcement policy, embodied in section 49.2.4.2 of the DLSE Manual, and the court, though not deferring to that policy, considered it to be persuasive. (*Alvarado, supra*, at pp. 567-568.)

After reaching that conclusion, the Supreme Court, in addressing arguments advanced by the defendant employer, noted "[i]t might be argued that defendant's attendance bonus is different from other types of flat-sum compensation because the bonus rewards only *weekend* work." (*Alvarado, supra*, 4 Cal.5th at p. 569.) The court found that argument unpersuasive because it "misunderstands what regular rate of pay is." (*Ibid.*) The court, citing DLSE Manual section 49.2.5, stated that regular rate of pay is a weighted average reflecting work based on varying rates and, therefore, "it is often the case that overtime worked during a low-paying shift is compensated based on an overtime pay rate that reflects, as part of the weighted average, higher pay rates earned during higher-paying shifts." (*Alvarado, supra*, 4 Cal.5th at pp. 569-570.)

Although the *Alvarado* court recited the weighted average method, the issue decided in *Alvarado* was the number of hours to use as a *divisor* for purposes of calculating the per-hour value of a flat-sum bonus. The issue in this case is how to calculate the regular rate of pay to use to determine the hourly overtime rate of dual rate employees. (*Alvarado, supra*, 4 Cal.5th at p. 568.)

In *Alvarado*, the relevant provision of the DLSE Manual that dealt with the matter of flat-sum bonuses was section 49.2.4.2. (*Alvarado, supra*, at pp. 567-568.) The

17

court reached a conclusion "consistent with the DLSE's policy" reflected in section 49.2.4.2. (*Alvarado, supra*, at p. 568.) In the present case, the relevant provisions of the DLSE Manual are sections 49.2.5 and 49.2.6. The *Alvarado* court reached no conclusions about those two sections. In its brief, one paragraph discussion of the weighted average method, the *Alvarado* court simply cited Labor Code section 246, subdivision (*l*)(1) (which refers to regular rate of pay without defining it), DLSE Manual section 49.2.5 (which is not binding and owed no deference), and 29 C.F.R. section 778.115 (which sets forth the federal weighted average policy). (*Alvarado, supra*, 4 Cal.5th at p. 569.) Previously in its opinion, the *Alvarado* court had explained that the DLSE Manual was not entitled to special deference and the manual's interpretation could be adopted "so long as we exercise our independent judgment" and "we are persuaded that it is correct." (*Id.* at p. 561.) The *Alvarado* court did not exercise independent judgment with respect to or engage in any analysis of DLSE Manual section 49.2.5, the section at issue in this case.

Further, the *Alvarado* court rejected using a 40-hour work week, instead of actual hours worked, as the divisor for calculating the per-hour value of a flat-sum bonus because "[s]uch a rule would contradict the principle that our state's labor laws must be liberally construed in favor of worker protection." (*Alvarado, supra*, 4 Cal.5th at pp. 566-567.) As we shall explain at length in subpart III.C.3, the evidence at trial demonstrated that the rate-in-effect method would better protect dual rate employees.

The *Alvarado* court's comments about calculating regular rate of pay for dual rate employees were unnecessary to the court's decision and therefore constituted dicta. (*People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 [dictum (plural, dicta) is a judicial comment that is unnecessary to the decision at hand].) The California Supreme Court long ago explained the effect of dicta: "It is the invariable rule, well understood by the profession, that an opinion of this court becomes authority only upon the point decided, and that obiter dicta are of no binding force or effect." (*Morse v. De Ardo*

18

(1895) 107 Cal. 622, 626, italics omitted; see *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [a decision is authority only for the points actually considered and actually decided].)

Dictum, though not precedential, may be considered persuasive (*People v. Vang, supra*, 52 Cal.4th at p. 1047, fn. 3) if "'it demonstrates a thorough analysis of the issue or reflects compelling logic'" (*Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1149; see *People v. Bueno* (2019) 32 Cal.App.5th 342, 350 [courts are to be guided by dictum if it remains ""analytically persuasive""]). The *Alvarado* court's comments about the weighted average method did not reflect an analysis of the issue of calculating regular rates of pay for dual rate employees. The *Alvarado* court had no cause to decide whether to use the weighted average method or the rate-in-effect method, and there is no indication the court intended to endorse section 49.2.5 of the DLSE Manual.

Accordingly, we hold that state law does not bind us to accept the weighted average method as the exclusive method for calculating the regular rate of pay for dual rate employees for compensating overtime work. The trial court, which also decided that it was not required to accept the weighted average method, concluded that Defendants did not violate California law by using the rate-in-effect method.

C. *Use of the Rate-in-effect Method Conferred Greater Benefit on Defendants' Dual Rate Employees Than the Weighted Average Method*

1. *Summary*

Plaintiffs argue we should adopt the weighted average method because it is supported by the DLSE enforcement policy, is consistent with federal regulation, and better advances California public policy than the rate-in-effect method. Defendants argue we should adopt the rate-in-effect method because the evidence at trial showed it is more beneficial to employees and therefore better advances California public policy than the weighted average method.

19

The trial court considered the DLSE Manual and two DLSE opinion letters.[6] The court trenchantly criticized the letters as "contradictory, inconsistent, inadequately reasoned" and the DLSE Manual as reflecting "no 'expertise and special competence' with the problem at issue." The court concluded, "the DLSE Manual does not mandate application of the weighted average method in general, and certainly does not support its application in the circumstances of this case."

We do not address the DLSE opinion letters or decide which method an employer must invariably use to calculate regular rate of pay for dual rate employees. We conclude, based on the evidence presented in this case, Defendants did not violate the law because, by using the rate-in-effect method for calculating regular rate of pay, Defendants conferred a net benefit on dual rate employees greater than what they would have received had Defendants used the weighted average method.

2. *Whether Defendants' Use of the Rate-in-effect Method Was Lawful Depends on the Overall Effect on All Dual Rate Employees*

To determine whether Defendants' policy and practice of using the rate-in-effect method underpays employees, we must assess the net effect of that policy and practice on the entire group of dual rate employees during the relevant time period. We agree with the trial court that the "time-rounding" cases illustrate and support this point.

First, some background on time rounding: Federal regulation permits employers to compute employee worktime by rounding "to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour," provided that the rounding system adopted by the employer "is used in such a manner that it will not result, over a period of time, in

---

[6] Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No 1992.04.27-1, Calculation of Regular Rate of Pay (Apr. 27, 1992) <http://www.dir.ca.gov/dlse/opinions/1992-04-27-1.pdf>; Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1993.03.31, "On-Call" Time-Beepers (Mar. 31, 1993) <http://www.dir.ca.gov/dlse/opinions/1993-03-31.pdf>.

failure to compensate the employees properly for all the time they have actually worked." (29 C.F.R. § 785.48(b).) Almost all federal district courts interpreting that provision have concluded that a time-rounding system is valid if it "average[s] out sufficiently" and have rejected claims that minor discrepancies in one employee's wage calculations establish that the employee is entitled to assert a claim for underpayment of wages. (E.g., *Alonzo v. Maximus, Inc.* (C.D.Cal. 2011) 832 F.Supp.2d 1122, 1126-1127; *East v. Bullock's, Inc.* (D.Ariz. 1998) 34 F.Supp.2d 1176, 1184.) The DLSE has adopted the federal regulation for time rounding. (DLSE Manual, *supra*, § 47.3, p. 47-1; see *AHMC Healthcare, Inc. v. Superior Court* (2018) 24 Cal.App.5th 1014, 1023, fn. 9 (*AHMC*).)

In *See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889, 901 to 902 (*See's I*) the Court of Appeal addressed the issue whether the federal time-rounding standard was permissible under California law. The employer in *See's I* enforced a policy of rounding time up or down to the nearest one tenth of an hour. (*Id.* at p. 892.) The plaintiff employee contended this policy violated California law because it denied employees full compensation for time worked. (*Id.* at pp. 893, 900.) The Court of Appeal concluded a rounding policy is permissible under California law if the policy is neutral on its face and as applied, and "its *net effect* is to permit employers to efficiently calculate hours worked without imposing any burden on employees." (*Id.* at p. 903, italics added.)

In a subsequent decision, *Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235 (*See's II*), the Court of Appeal affirmed summary judgment in favor of the employer on the rounding issue. The court upheld the practice of rounding time up or down to the nearest tenth of the hour because that practice was neutral and yielded a net economic benefit for employees as a group—67 percent of the employees had either no impact or a net gain under the rounding policy. (*Id.* at p. 242.) The court concluded the employer had "met its burden to show the rounding policy is fair and neutral on its face

21

and is used in a manner that over a relevant time period will compensate the employees for all the time they have actually worked." (*Id.* at p. 252.)

In *AHMC, supra*, 24 Cal.App.5th at page 1014, the Court of Appeal addressed the issue whether an employer's use of a payroll system that automatically rounds employee time up or down to the nearest quarter hour violated California law. (*Id*. at p. 1016.) The plaintiffs, acting on behalf of themselves and a putative class, alleged the rounding policy violated California law requiring employers to compensate employees for time actually worked. (*Id*. at p. 1017.) The employer contended its time records established that the rounding policy was lawful because it was facially neutral, was applied fairly, and provided a net benefit to employees considered as a whole. (*AHMC, supra,* at p. 1019.)[7] The plaintiff employees contended the rounding policy was unlawful because it resulted in undercompensation for a slight majority of employees: According to plaintiffs, a rounding policy that results in any loss to any employee, no

---

[7] The time records showed that, at one of the employer's facilities, the rounding policy added 9,476 hours to the pay of 49.3 percent of the workforce (709 employees) and left 1.2 percent of the workforce (17 employees) unaffected, while 49.5 percent of the workforce (713 employees) lost time (a total of 8,097 hours). (*AHMC, supra,* 24 Cal.App.5th at p. 1018.) On a day-by-day analysis, the policy added time to 45.2 percent of the employee shifts (4.96 minutes per day on average), reduced time from 43.3 percent of employee shifts (4.82 minutes per employee shift on average), and had no effect on 11.6 percent of employee shifts. (*Ibid*.) Overall, the number of minutes added to employee time by the rounding policy exceeded the number of minutes subtracted, adding 1,378 hours to the employees' total compensable time. (*Ibid*.)

Time records showed that at a second facility the rounding policy added time (17,464 hours) to the pay of 47.1 percent of the workforce (861 employees), and had no effect on 0.8 percent of the workforce (14 employees) while 52.1 percent of the workforce (953 employees) lost time (13,588 hours total). (*AHMC, supra,* 24 Cal.App.5th at p. 1018.) On a day-by-day analysis, the policy added compensable time to 46.6 percent of the employee shifts examined, reduced compensable time from 42.3 percent of the employee shifts examined, and had no effect on 11 percent. (*Ibid*.) Overall, the rounding policy added 3,875 hours to the employees' total compensable time. Of the two named plaintiffs, one lost a total of $118.41 over a four-year period and the other lost $63.70 over a ninth-month period. (*Id*. at p. 1019.)

matter how small the loss, and even if offset by some benefit to other employees, violates California employment law.  (*Ibid.*)

In determining whether the employer's rounding policy was lawful, the Court of Appeal sought guidance from the federal regulation allowing employers to round employee time up or down, several federal district court decisions, and a recent federal appellate court opinion, *Corbin v. Time Warner Entertainment-Advance/Newhouse Partnership* (9th Cir. 2016) 821 F.3d 1069 (*Corbin*).  (*AHMC, supra*, 24 Cal.App.5th at pp. 1020-1022.)  In *Corbin*, the Ninth Circuit rejected the argument that a rounding policy violates federal law if any one employee loses any amount of compensation from application of policy. (*Corbin, supra*, at pp. 1076-1077.)  Such an argument, the Ninth Circuit concluded, would "read[] into the federal rounding regulation an 'individual employee' requirement that does not exist." (*Id.* at p. 1077.)  The Ninth Circuit held that the employer's rounding policy was lawful, even though some employees did not benefit from it, because the policy was facially neutral and neutral in application.  The policy was facially neutral because the employer rounded all employee time up or down to the nearest quarter hour "without an eye towards whether the employer or the employee is benefitting from the rounding." (*Id.* at pp. 1078-1079.)  The policy was neutral in application because, as shown by the plaintiff's own time records, an employee might sometimes gain minutes and sometimes lose minutes.  (*Id.* at p. 1079.)

After considering *Corbin*, and other federal cases, the *AHMC* court concluded the employer's rounding policy was neutral on its face because it was applied to all employees without regard to whether the employer or employee benefitted from the rounding.  (*AHMC, supra*, 24 Cal.App.5th at p. 1027.)  The rounding policy was neutral in application because at one facility a minority of employees lost time, and, although a slight majority of employees at the second facility lost time, employees overall were compensated for 3,875 more hours than were worked.  (*Ibid.*)  The *AHMC* court agreed

23

with *Corbin* opinion that "the regulation does not require that every employee gain or break even over every pay period or set of pay periods analyzed; fluctuations from pay period to pay period are to be expected under a neutral system." (*Ibid.*) The *AHMC* court also agreed with *See's I* and *See's II* that "a system is fair and neutral and does not systematically undercompensate employees where it results in a net surplus of compensated hours and a net economic benefit to employees viewed as a whole." (*Id.* at p. 1028.) Because the employees benefitted overall from the employer's rounding policy, the fact that "a bare majority lost a minimal amount of time" did not render the policy unlawful. (*Ibid.*)

The rounding cases are significant to the present case in two important respects. First, they establish that the lawfulness of Defendants' dual rate overtime policy must be determined by looking at the policy's net effect on overall employee compensation. For the policy to be lawful, it is not necessary for every employee in every pay period to have benefited or broken even from the policy's operation. Unless the law or regulation in question has an individual employee standard, the policy is not unlawful simply because one employee has lost any amount of compensation from it.

Second, the rounding cases establish that Defendant's dual rate overtime policy, if otherwise lawful,[8] would not violate California employment law if the policy is neutral on its face and neutral in application. A policy is neutral on its face if it applies to all employees without regard to whether the employer or employee benefits from the policy's operation. (*AHMC, supra*, 24 Cal.App.5th at p. 1027.) A policy is neutral in application if it does not systematically undercompensate employees, and "a system is fair and neutral and does not systematically undercompensate employees where it results

---

[8] The rate-in-effect method is not prohibited by statute, rule, regulation, or court decision. The DLSE endorses the weighted average method, but statements in the DLSE Manual are not binding. (*See's I, supra*, 210 Cal.App.4th at p. 902.)

in a net surplus of compensated hours and a net economic benefit to employees viewed as a whole." (*Id.* at p. 1028.)

In the rounding cases, the employers were following a policy approved and enforced by the DLSE and federal regulation, while in this case Defendants were following a policy in conflict with DLSE policy and federal regulation. We do not believe this distinction makes the rounding cases any less persuasive or relevant. Here, we must decide whether Defendants' use of the rate-in-effect method was lawful, just as the courts in the rounding cases had to decide whether the employers' rounding policies were lawful. The DLSE Manual is not binding, and we have concluded that *Alvarado* does not mandate use of the weighted average method. Thus, in both the present case and in the rounding cases, the lawfulness of the employer's policy must be based on the soundness of the policy itself, and not by reference to the DSLE Manual or federal regulation. And to make that determination, we must assess the net effect of the policy on employees overall.

3. *The Evidence at Trial Established that Defendants' Dual Rate Employees Received an Overall Net Benefit from the Rate-in-effect Method*

a). Defendants' Policy Was Neutral on Its Face

Defendants' policy of using the rate-in-effect method was neutral on its face. Defendants applied the policy equally to all dual rate employees without regard to whether the policy benefited Defendants or their employees. Dragas testified he made the decision to use the rate-in-effect method based on his beliefs that he was following industry standard and the rate-in-effect method would better compensate harder working employees. During the final hours of the workday, some workers participated in a management training program that was higher paid than other shifts; use of the rate-in-effect method would ensure that such employees would get paid for all overtime at the higher rate.

b). Defendants' Policy Was Neutral in Application

Defendants' policy of using the rate-in-effect method was neutral in application. The trial court found: "[T]he undisputed evidence here demonstrates that the named Plaintiffs and PAGA group members financially benefitted from Defendants' use of the [last] rate-in-effect method. Stated otherwise, there is no evidence that the named Plaintiffs and PAGA group members were systematically undercompensated because of the method used by Defendants to calculate overtime compensation in dual rate workweeks." Substantial evidence supports these findings.

i). Plaintiffs' Expert

Plaintiffs' expert, William Roberts, Ph.D., conducted a study of overtime pay of dual rate employees and made findings on a pay-period basis. The only named plaintiffs for the dual rate overtime subclass were Levanoff and Diaz. Roberts determined that Levanoff had worked seven dual rate periods. Of those seven periods, one pay period resulted in Levanoff receiving 98 cents less overtime pay than he would have received using the weighted average method, and six pay periods resulted in a total of $34.31 more overtime pay than under the weighted average method. Thus, in total, Levanoff received $33.33 more overtime pay due to Defendants' use of the rate-in-effect method.

Roberts determined that plaintiff Diaz had worked seven dual rate pay periods. Of these, three pay periods resulted in a total of 70 cents less overtime pay than she would have received under the weighted average method, and four pay periods resulted in a total of $18.62 more overtime pay than she would have received under the weighted average method. Thus, in total, Diaz received $17.75 more overtime pay due to Defendants use of the rate-in-effect method.

Roberts also conducted a class-wide study and made class-wide conclusions. Roberts determined that of the 305 dual rate PAGA group members, 158 (51.8 percent) never worked a pay period in which the weighted average would have

26

resulted in more overtime pay. Of the 1,332 dual rate pay periods identified, in only 342 (25.7 percent) did employees receive less overtime pay by use of the rate-in-effect method. In 990 of those pay periods (74.3 percent), the employees received more overtime pay than they would have received under the weighted average method. Of the 157 employees who did experience a pay period in which the weighted average method would have resulted in more overtime pay, the difference was $601.24 in total over the nearly six years analyzed (September 2010 through January 2016). In those pay periods in which the rate-in-effect method resulted in greater overtime pay, employees received $2,666.98 more than they would have received using the weighted average method. Thus, overall, the dual rate overtime PAGA group members were paid $2,065.74 more because Defendants had used the rate-in-effect method instead of the weighted average method.

### ii). Defendants' Expert

Defendants' expert, Robert Crandall, also analyzed dual rate overtime compensation for Levanoff and Diaz. Crandall determined that Levanoff had received $30.99 and Diaz had received $3.88 more overtime pay due to Defendants' use of the rate-in-effect method than they would have received under the weighted average method.

Crandall also conducted an overtime compensation analysis for the entire dual rate overtime PAGA group. Crandall used both a "total weekly earnings" analysis and an analysis that isolated premium pay. Using the total weekly earnings analysis, Crandall determined that of the 1,585 dual rate workweeks, employees received less overtime pay by use of the rate-in-effect method in 723 weeks (45.62 percent), and received more overtime pay in 862 weeks (54.38 percent). Of the 324 employees who worked dual rate workweeks, 147 (45.4 percent) received less overtime pay while 177 (54.6 percent) received greater overtime pay under the rate-in-effect method. Of the 147 employees for whom the weighted average method would have resulted in more overtime pay in a given workweek, the difference was $145.35 in total. In those pay periods in

27

which the rate-in-effect method resulted in greater overtime pay, employees received a total of $341.14 more than they would have received under the weighted average method. Overall, the PAGA group members were paid $195.79 more because Defendants used the rate-in-effect method instead of the weighted average method.

Crandall's overtime-only analysis yielded similar results. Crandall determined that of the 1,585 dual rate workweeks, employees received, by use of the rate-in-effect method, less overtime pay in 695 of those weeks (43.85 percent) and more overtime pay in 890 of those weeks (56.15 percent). Of the 324 employees who worked a dual rate workweek, 136 (42 percent) received less overtime pay and 188 (58 percent) received greater overtime pay by use of the rate-in-effect method. Of the 136 employees for whom the weighted average would have yielded more overtime pay in a given workweek, the difference was $63.01, while in those pay periods in which the rate-in-effect method resulted in greater overtime pay, employees received $214.75 more than they would have received under the weighted average method. Overall, the dual rate overtime PAGA group members were paid $151.74 more in overtime pay because Defendants used the rate-in-effect method instead of the weighted average method.

iii). Analysis

Plaintiffs do not challenge this evidence. Instead, they point to the instances in which the weighted average method would have yielded slightly greater overtime pay for a particular employee in a particular pay period. Plaintiffs contend those instances constitute violations of California law, even though Defendants' dual rate employees overall received a net benefit from use of the rate-in-effect method.

The courts in *Corbin, supra*, 821 F.3d at page 1077 and *AHMC, supra*, 24 Cal.App.5th at page 1027 rejected this "individual employee" standard for rounding policies in favor of a standard based on facial neutrality and neutrality in practice. We reject the individual employee standard for calculating the regular rate of pay for dual rate employees in this case, not least because it would lead to an absurd result. Here,

28

Roberts found that 77 dual rate employees were underpaid a total of $460.36. In addition to these unpaid wages, Plaintiffs claim interest and penalties resulting in a total class award of a whopping $172,400.94. Yet Roberts himself found that the dual rate overtime PAGA group members were paid $2,065.74 more overall because Defendants had used the rate-in-effect method. Imposing penalties of any amount against Defendants under these circumstances would be unjust.

In addition, an individual employee standard would create a bookkeeping nightmare for employers by requiring them to calculate two separate figures for regular rate of pay and to pay overtime hours to dual rate employees based on whichever calculation yields the higher compensation. Moreover, sections 49.2.5 and 49.2.6 of the DLSE Manual, like the time-rounding federal regulations, do not have any language suggesting an individual employee standard is required. (See *Corbin, supra,* 821 F.3d at p. 1077.)

The evidence presented at trial disproves Plaintiffs' assertion, and the assumption by the DLSE, that the weighted average method of the DLSE Manual always better protects and benefits workers than does the rate-in-effect method. The rate-in-effect method has been criticized as being more open to manipulation by employers, who might assign dual rate employees to lower rate positions at the end of the workday. The evidence presented in this case strongly refutes rather than supports that thesis.[9] The undisputed evidence established that Defendants adopted the rate-in-effect method because employees in management training were working at *higher* hourly rates at the end of the workday.

---

[9] The trial court found, "the evidence belies any incentive for manipulation." The evidence at trial demonstrated: (1) the dual rate issue occurred in only 2.3 percent of the 70,232 workweeks analyzed, (2) the dual rate issue affected only about 300 of the more than 1,600 PAGA group members, and (3) the difference in overtime pay between the two methods accounted for 0.04 percent of the total compensation paid to dual rate PAGA group members during all dual rate workweeks.

4. *Defendants' Use of the Rate-in-effect Method Comports with California Public Policy as Expressed in* Alvarado

An "overarching interpretive principle" is that California's employment laws must be liberally construed to promote the protection and benefit of workers. (*Alvarado, supra*, 4 Cal.5th at pp. 561-562.)  "'[I]n light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection.'"  (*Brinker, supra*, 53 Cal.4th at pp. 1026-1027.)  This principle of liberal construction does not, according to the evidence presented at trial, support a requirement that employers use the weighted average method.

The evidence presented at the trial in this case would support a conclusion that the rate-in-effect method, not the weighted average method, *must* be used by employers because it better promotes the benefit of dual rate employees than does the weighted average method.  Any claims about the benefit to employees of the weighted average method would be supposition because, to our knowledge, sections 49.2.5 and 49.2.6 of the DLSE Manual have never been vetted or made subject to scrutiny by employers, employees, and the general public—except at trial in this case.

But we need not go so far as to decide between the two methods.  The only issue presented is whether Defendants violated California law, specifically, Labor Code section 1194, by using the rate-in-effect method for calculating the regular rate of pay for purposes of paying dual rate employees for overtime hours.

D. *Conclusion*

Defendants did not violate California employment law because the rate-in-effect method, as demonstrated by the evidence, was neutral on its face and in application.  The rate-in-effect method yielded net greater overtime pay in total and for more employees than would have the weighted average method and therefore resulted in a net greater benefit overall for Defendants' employees.  If Defendants had used the

weighted average method instead of the rate-in-effect method, a majority of their dual rate employees would have received less overtime pay and Defendants would have paid less overtime pay to dual rate employees as a whole. Thus, even assuming the weighted average method were required, Defendants would not have violated California law because they paid Plaintiffs and the dual rate overtime PAGA group members more overtime compensation overall than legally required.

Plaintiffs never presented the dual rate overtime claim to the LWDA and never explicitly pleaded it in any of their complaints. The claim appears to have been an afterthought, and meritless at that. We cannot help but agree with trial court that the dual rate overtime claim did not vindicate the rights of Defendants' employees, who, even according to Plaintiffs' expert, came out better from use of the rate-in-effect method.

Because we conclude Defendants did not violate California law by using the rate-in-effect method, we need not address whether Plaintiffs agreed to that method or whether the de minimis principle applies.

### IV.

### The Trial Court Did Not Err By Decertifying the Dual Rate Overtime Subclass

Plaintiffs agreed that the trial court's findings and conclusions from the bench trial on the dual rate overtime PAGA claim would be carried forward into the jury trial on the dual rate overtime subclass claim and bind the jury. Only the issue of damages would be left for the jury to decide. The trial court's conclusion that Defendants did not violate California employment law by using the rate-in-effect method, a decision we affirm, meant Defendants could not be liable for class damages. As Defendants were not liable under the dual rate overtime claim, there were no issues for the jury to decide, and the trial court did not err by granting Defendants' motion to decertify the class.

Plaintiffs argue that allowing decertification of the dual rate overtime subclass was "especially unwarranted" because it was certified in 2014, and since that

31

time the trial court has denied three motions for decertification. Class decertification requires a change in circumstances, such as new law or newly discovered evidence, that would make continued class treatment improper. (*Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1360-1361.) The change in circumstances in this case was the trial on the dual rate overtime PAGA claim and the trial court's finding, based on the evidence at that trial, that Defendants did not violate California employment law by using the rate-in-effect method. Continued class treatment after the court's ruling was improper because there was no liability on which to award class damages.

## DISPOSITION

The order decertifying the dual rate overtime subclass and the order dismissing the PAGA claims are affirmed. Respondents to recover costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.